# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# GREENVILLE DIVISION

**EDWARD DALON, Surviving Spouse and**     **PLAINTIFF**
**Administrator of the Estate of Judy L.**
**Dalon, Deceased**

**V.**     **NO. 4:15-CV-00086-DMB-JMV**

**RULEVILLE NURSING AND**
**REHABILITATION CENTER, LLC**     **DEFENDANT**

## ORDER DENYING MOTION TO COMPEL ARBITRATION

This wrongful death action is before the Court on Defendant Ruleville Nursing and Rehabilitation Center, LLC's motion to compel arbitration. Doc. #4. For the reasons below, the motion to compel arbitration will be denied without prejudice.

### I
### Procedural History

On June 2, 2015, Plaintiff Edward Dalon filed a complaint in the Circuit Court of Sunflower County, Mississippi, as "Surviving Spouse and Administrator of the Estate of Judy L. Dalon, Deceased." Doc. #2. In his complaint, Edward[1] alleges that his wife Judy died as a result of negligence while a patient at Defendant's nursing home facility. *Id*. at ¶ 31.

On July 7, 2015, Defendant removed the state action to this Court on the grounds of diversity jurisdiction. Doc. #1. Eight days later, on July 15, 2015, Defendant filed a motion to compel arbitration. Doc. #4. Edward responded to the motion to compel within the time allowed, Doc. #10, and Defendant filed a timely reply, Doc. #14. On November 3, 2015, this Court, acting on motion of Edward, granted leave to file a sur-reply opposing the motion to

---

[1] To avoid confusion, the Court will refer to the Dalons by their first names.

compel arbitration. Doc. #17. Edward timely filed his sur-reply on November 9, 2015. Doc. #18.

## II
## Relevant Standard

The Federal Arbitration Act ("FAA") "permits an aggrieved party to file a motion to compel arbitration when an opposing party has failed, neglected, or refused to comply with an arbitration agreement." *Am. Bankers Ins. Co. of Fl. v. Inman*, 436 F.3d 490, 493 (5th Cir. 2005) (internal quotation marks omitted) (citing 9 U.S.C. § 4). "On a motion to compel arbitration by an aggrieved party, the Court shall decide the issue of arbitrability summarily." *Marsh v. First USA Bank, N.A.*, 103 F.Supp.2d 909, 914 (N.D. Tex. 2000) (citing 9 U.S.C. § 4). Thus, "evidence on the motion may be received by the Court." *Id*.

The FAA directs that "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, … the court shall hear and determine such issue." 9 U.S.C. § 4. Where a jury trial has not been demanded, a district court may satisfy its duty under § 4 by holding an evidentiary hearing. *See Chester v. DirecTV, L.L.C.*, 607 F. App'x 362, 365 (5th Cir. 2015). However, the Fifth Circuit has observed that, notwithstanding § 4's language, where a party has not requested a hearing, a "district court is not required to conduct a hearing on this threshold determination." *Armstrong v. Assocs. Intern. Holdings Corp.*, 242 F. App'x 955, 959 (5th Cir. 2007) (citing *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 145 (2d Cir. 2001)); *see also Marks 3 Zet-Ernst Marks GmBh & Co. v. Presstek, Inc.*, 455 F.3d 7, 14 (1st Cir. 2006) ("Marks has assumed that the 'shall hear the parties' statement in 9 U.S.C. § 4 refers to a live evidentiary hearing. That may not be so. Rather, a 'hearing' on the papers may be all that is required."). Rather, even when the

making of an arbitration agreement is in issue, a district court may determine the existence of an arbitration agreement based on a paper record when either: (1) the evidentiary record reveals no genuine issue of material fact, *see Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 978 (10th Cir. 2014) ("When it's apparent from a quick look at the case that no material disputes of fact exist it may be permissible and efficient for a district court to decide the arbitration question as a matter of law through motions practice and viewing the facts in the light most favorable to the party opposing arbitration.");[2] or (2) the parties were afforded a sufficient opportunity to argue and develop the evidentiary record, *see Titan, Inc.,* 241 F.3d at 145 ("Although the district court did not hold an evidentiary hearing, the parties filed multiple briefs and extensive evidence with the court over a two-year period."); *see also Armstrong*, 242 F. App'x at 959 (citing *Titan, Inc.*, with approval).

Consistent with this authority, this Court has determined the validity of an arbitration agreement without a hearing when: (1) the parties were granted leave to conduct arbitration-related discovery and submitted a thorough evidentiary record, *see Cotton v. GGNSC Batesville, LLC*, 3:13-cv-169, 2015 WL 1310034, at *1–2 (N.D. Miss. Mar. 24, 2015); and (2) there was no factual dispute and the sole issue before the Court was one of law, *see Dykes v. Cleveland Nursing & Rehab. Ctr.*, No. 4:15-cv-76, 2016 WL 426546, at *6 (N.D. Miss. Feb 3. 2016).

Here, Edward has not demanded a jury trial to determine the validity of the Agreement.[3] Accordingly, before turning to the merits of Defendant's motion, the Court must answer two

---

[2] *See also Insur. Newsnet.com, Inc. v. Pardine*, No. 1:11-cv-286, 2011 WL 3423081, at *2 (M.D. Pa. Aug. 4, 2011) ("[C]ourts have held that Section 4 does not require an evidentiary hearing where there is an absence of disputed facts.") (collecting cases).

[3] There is no dispute that Edward requested a jury trial for his underlying claims and has continued to assert this right in his briefing. *See* Doc. #2 at 9; Doc. #11 at 6. However, "a general jury demand in a complaint does not obviate the need to specifically request a jury trial under Section 4 of the FAA …." *King v. Capital One Bank (USA), N.A.*, No. 3:11-cv-68, 2012 WL 4404862, at *1 (W.D. Va. Sep. 25, 2012). Edward has never sought a jury trial pursuant to section 4.

questions. First, the Court must decide whether, based on the evidentiary record, the question of making of the Agreement is in issue before the Court; if it is not, the Court may turn to the merits. *See* 9 U.S.C. § 4. However, if the making of the Agreement is in issue, the Court must decide whether an evidentiary hearing is required for a merits resolution. If the Court reaches the merits, Defendant, as the party seeking to compel arbitration, must prove the required elements by a preponderance of the evidence. *Grant v. Houser,* 469 F. App'x 310, 315 (5th Cir. 2012) (citing *Banks v. Mitsubishi Motors Credit of Am., Inc.,* 156 F. App'x 710, 712 (5th Cir. 2005)).

### III
### Factual Background

**A. Judy's Admission to Defendant's Facility**

On March 19, 2013, Judy arrived at Defendant's nursing home facility on a "company van." Doc. #10-1. According to Edward, at the time Judy arrived, she:

> [n]eeded assistance with all activities of daily living. She was unsteady. She experienced crying episodes. She could not drive a car and was unable to work. She was not able to manage her financial affairs. She did not have a credit card or checking account. She did not pay bills for herself or the family. She was not competent to make decisions with respect to her health needs, including who would provide her with care and treatment …. [She] was taking numerous prescription medications, including medications for depression, agitation, psychosis, and Huntington's Disease.

Doc. #10-7 at ¶ 7–8.

The same day, Jacquelyne D. Brown, an admitting nurse at Defendant's facility, noted that, although Judy seemed "Alert," she suffered from "Intermittent Confusion" and was "Forgetful." Doc. #10-1; Doc. #14-1. As a part of Judy's admission paperwork, Brown made

4

the following "Admitting Diagnos[e]s: Depressive D/O, Heart Ox, Hypothyroidism, Cardiac Dysrhythmia, [and] Huntington Chorea."[4] Doc. #10-1.

Also related to Judy's admission, Brown completed a "Morse Fall Scale" evaluation of Judy. Doc. #10-2. Under the "Mental Status" heading of the test, the form instructs the test administrator to: "Ask the resident, 'Are you able to go to the bathroom alone, or do you need assistance.'" *Id*. at 2. The form further directs that if "[t]he resident's response is not consistent with nursing orders [or] the resident's response is unrealistic, then he/she is considered to overestimate his/her own abilities and to be forgetful of limitations." *Id*. On Judy's form, Brown checked the box "Overestimates or forgets limits." *Id*. at 1. Other admission paperwork completed by Brown on the day of admission reflects that Judy was suffering from a "Mild/Moderate [Mental] Impairment"[5] and was taking "Anti-psychotics." Doc. #10-3; Doc. #10-4.

In sum, at the time of admission, Brown found Judy to be "[a]lert and oriented to person. Able to follow simple commands and understands verbalizations from others. Speech slow but clear." Doc. #14-1.

### B. The Arbitration Agreement and Admission

Sometime during the admission process on March 19, 2013, Judy signed a "Resident and Facility Arbitration Agreement" ("Agreement"). Doc. #4-1. Neither Edward nor any of Judy's friends or family were present when Judy signed the Agreement. Doc. #10-7 at ¶ 12.

---

[4] "Huntington [C]horea" is defined as "a neurodegenerative disorder, with onset usually in the third or fourth decade, characterized by chorea and dementia …." Stedmans Medical Dictionary 172670 (West. 2014).

[5] Under the "Mental Status" heading, the form contains a score of "2" with a strike through it, followed by the admitting nurse's initials and the number "1." Doc. #10-3. Under the relevant rubric, a score of "1" represents a "Mild/Moderate Impairment" and a score of "2" represents a "Severe Impairment." *Id*.

The Agreement, which was also signed by a representative of Defendant, provided in relevant part:

> **THIS AGREEMENT MUST BE SIGNED IN ORDER FOR THE RESIDENT TO RECEIVE SERVICES AT THE FACILITY ….**
>
> **2. Those Signing this Contract.** ... The Resident … understands that he/she can seek legal counsel prior to entering into this contract and is encouraged to ask questions. **IF YOU DO NOT WISH TO SIGN THIS AGREEMENT, WE WILL ASSIST YOU IN FINDING PLACEMENT AT A DIFFERENT FACILITY.**
>
> **3. Agreement to Submit Disputes to Binding Arbitration.** Any and all disputes between the Resident and the Facility shall be submitted to binding arbitration where the amount in controversy exceeds $25,000. This includes any disputes arising out of or in any way relating to this Agreement (its enforceability) the Admission Agreement, or any of the Resident's stays at the Facility, whether existing or arising in the future ….
>
> **5. Arbitration Procedure.** … It is the intention of the parties that this Agreement shall inure to the benefit of and bind the Facility, its affiliated entities, representatives, medical directors, employees, successors, assigns, and agents, and shall inure to the benefit of and bind the Resident, his/her successors, assigns, agents, attorneys, third party beneficiaries, insurers, heirs, trustees and representatives, including the personal representative or executor of the estate, the spouse, children, grandchildren, all decedents and next friends, and any person whose claim is derived through the Resident.

Doc. #4-1 (emphasis in original). Judy was admitted to Defendant's facility on or about March 19, 2013, under the care of "Dr. Aquino." Doc. #14-1.

### C. Post-Admission Determinations of Judy's Mental Condition

One week after Judy's admission, Dr. Aquino conducted a "Review of Systems" of Judy. Doc. #14-2. Under the "Neurological" heading of his review, Dr. Aquino noted that Judy was not suffering from "headaches, paresthesias, confusion, dysarthria or gait instability." *Id*. Under the "Psychiatric" heading, Dr. Aquino noted "[n]o anxiety or depression." *Id*.

On April 3, 2013, one week after Dr. Aquino's review, two nurses – Yulonda Brown, RN, and Delores Walker, LPN – completed a care plan for Judy. Doc. #10-6. The plan noted

6

that, as of March 19, 2013, Judy suffered from "cognitive impairment r/t long and short-term memory deficit: impaired decision and communication" and "require[d] assistance with all [activities of daily living]."[6] *Id*. at 3, 6.

## IV
## Analysis

As explained above, before turning to the merits of the motion to compel, the Court must decide whether the making of the Agreement is in issue and, if so, whether a hearing is required to decide the Agreement's validity.

### A. Making of the Arbitration Agreement

In order to place the making of an arbitration agreement in issue within the meaning of section 4, "a party contesting the 'making' of the arbitration agreement must 'make at least some showing that under prevailing law, he would be relieved of his contractual obligations to arbitrate if his allegations proved to be true … and produce some evidence to substantiate his factual allegations.'" *Am. Heritage Life Ins. Co v. Orr*, 294 F.3d 702, 710 (5th Cir. 2002) (quoting *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1154 (5th Cir. 1992)) (internal punctuation omitted). In this regard, Edward argues that the Agreement is unenforceable because it is procedurally unconscionable and because Judy lacked capacity to sign the document. Doc. #11 at 5–9.

"A two-step analysis is applied to determine whether a party may be compelled to arbitrate. First, [the court] ask[s] if the party agreed to arbitrate the dispute. If so, [the court] then ask[s] if any federal statute or policy renders the claims nonarbitratable." *Sherer v. Green Tree Servicing LLC,* 548 F.3d 379, 381 (5th Cir. 2008) (internal citations and quotation marks

---

[6] "Activities of daily living" ("ADL") are defined as "[e]veryday routines generally involving functional mobility and personal care, such as bathing, dressing, toileting, and meal preparation." Stedmans Medical Dictionary 9770 (West 2014).

7

omitted). Neither party has identified a federal statute or policy rendering the claims nonarbitratable. Accordingly, the only question before the Court is whether the parties agreed to arbitrate this dispute.

In order to determine whether parties agreed to arbitrate a dispute, the Court must answer two questions: "(1) is there a valid agreement to arbitrate the claims and (2) does the dispute in question fall within the scope of that arbitration agreement." *Sherer,* 548 F.3d at 381. There is no dispute here that the underlying action falls within the scope of the Agreement. Thus, the Court initially must only decide whether Edward has produced sufficient allegations and corresponding evidence to make "some" showing that the Agreement is unenforceable on the grounds of procedural unconscionability or lack of capacity. *See Orr*, 294 F.3d at 710.

### 1. Judy's Capacity to Contract

"In determining whether an agreement to arbitrate exists, [courts] apply ordinary contract principles." *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003) (internal quotation marks omitted). Such principles, in turn, are derived from relevant state law. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally … should apply ordinary state-law principles that govern the formation of contracts."); *see also Cook v. GGNSC Ripley, LLC,* 786 F.Supp.2d 1166, 1169 (N.D. Miss. 2011) (citing *Kaplan,* 514 U.S. at 943). The parties represent, and this Court agrees, that Mississippi law governs interpretation of the Agreement.

Under Mississippi law, "[t]he elements of a contract are (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) *parties with legal capacity to make a contract*, (5) mutual assent, and (6) no legal prohibition precluding contract

8

formation." *GGNSC Batesville, LLC v. Johnson*, 109 So.3d 562, 565 (Miss. 2013) (emphasis in original). For a person to have capacity to contract in Mississippi, she must be "mentally capable of understanding, comprehending, and appreciating the meaning, nature, and purpose of … every material term and provision thereof." *Hamilton Bros. Co. v. Narciese*, 158 So. 467, 470 (Miss. 1935); *see also* 5 Williston on Contracts § 10:8 (4th ed.) ("A person is considered incompetent to contract in the vast majority of jurisdictions if, under what is known as the cognitive test, she lacks sufficient mental capacity to understand the nature and effect of a particular transaction or her acts in relation to that transaction.").

Where, as here, a party seeks to avoid a contract based on mental incapacity, she must establish such incapacity by a "preponderance of proof." *Frierson v. Delta Outdoor, Inc.*, 794 So.2d 220, 224 (Miss. 2001). To this end, "testimony relating to th[e] particular time [the challenged instrument was executed] is entitled to the most weight." *Conerly v. Lewis*, 117 So.2d 460, 465 (Miss. 1960).[7] However, when evaluating capacity to contract, "[t]he law presumes that a person is sane and mentally capable to enter into a contract." *Parks v. Parks*, 914 So.2d 337, 341 (Miss. Ct. App. 2005) (citing *Frierson*, 794 So.2d at 224).

In seeking to show incapacity, Edward argues that, when Judy allegedly signed the Agreement: "she had Huntington's disease, suffered from intermittent confusion and forgetfulness, tended to overestimate her own abilities and forget her limits, had severe cognitive impairments, was taking anti-psychotic medications, and needed assistance with all activities of

---

[7] *Conerly* dealt with capacity to execute a deed rather than an arbitration agreement. Under Mississippi law, the standard for capacity to execute a deed is virtually identical to the standard for other contracts. *See Lang v. Jones*, 80 So.2d 783, 784 (Miss. 1955) ("In [action seeking to cancel deed for incapacity] the test is whether the grantor had mental capacity to understand the nature and effect of the transaction at the time the instruction was executed …."). However, where a party seeks to set aside a deed, rather than a standard contract, he must establish incapacity by clear and convincing evidence instead of preponderance of the evidence. *See Richardson v. Langley*, 426 So.2d 780, 783 (Miss. 1983). Notwithstanding the differences in the level of proof required, the Court deems jurisprudence on capacity to execute a deed, a form of contract, relevant to the inquiry here.

9

daily living." Doc. #11 at 6 (internal citations omitted). Edward further contends that "[g]iven Mrs. Dalon's mentally feeble state, she was … incapable of agreeing to anything, much less waiving her constitutional right to a jury trial, a right that is inviolate under Mississippi law." *Id*.

Upon consideration, the Court concludes that Edward's allegations regarding Judy's mental state at the time of her admission (that Judy was confused, forgetful, and suffering from either severe or moderate[8] cognitive impairments) are sufficient to make "some" showing that Judy lacked capacity to understand the terms of the Agreement.[9] *See Orr*, 294 F.3d at 710. Furthermore, the Court concludes that the medical records and Edward's affidavit provide sufficient evidentiary support to substantiate these allegations of incapacity. *See Chester*, 607 F. App'x at 364 (finding making of arbitration agreement to be in issue where party "unequivocally denied signing an arbitration agreement [and] provided some evidence that he did not sign an arbitration agreement—his affidavit"). Accordingly, the making of the Agreement is in issue by virtue of Edward's allegations and evidence regarding Judy's incapacity to contract.

### 2. Unconscionability of the Agreement

Under Mississippi law, "the usual defenses to a contract such as fraud, unconscionability, duress, and lack of consideration may be applied to invalidate an arbitration agreement, so long as the law under which the provision is invalidated is not applicable only to arbitration provisions." *E. Ford, Inc. v. Taylor*, 826 So. 2d 709, 714 (Miss. 2002). Mississippi "courts have

---

[8] As explained above, the form describing Judy's mental impairment was initially marked as "severe" but was later amended to reflect a "moderate" impairment. *See* Doc. #10-3.

[9] In its reply brief, Defendant, citing to *Forest Hill Nursing Center, Inc. v. McFarlan*, 995 So.2d 775, 780 (Miss. Ct. App. 2008), argues that "[o]nly a medical doctor may establish incapacity due to health reasons." Doc. #14 at 2. Similarly, Defendant, citing to *Estate of McCorkle v. Beeson*, 27 So.3d 1180, 1187 (Miss. Ct. App. 2009), contends that "because Plaintiff is not a doctor, his self-serving affidavit cannot establish Ms. Dalon's incapacity." Doc. #14 at 3. *McFarlan* considered the requirements of the Uniform Health-Care Decisions Act, which relates to the requirements for health-care surrogates, not capacity to contract. 995 So.2d at 780. *Beeson* merely held that a diagnosis, standing alone, is not evidence of incapacity without some explanation of what the diagnosis "carried with it." 27 So.3d at 1187. The Court is aware of no authority that requires a party to introduce the opinion of a medical doctor to establish incapacity to contract.

10

recognized two types of unconscionability, procedural and substantive." *Id*. (internal quotation marks omitted) (quoting *Pridgen v. Green Tree Fin. Servicing Corp.*, 88 F.Supp.2d 655 (S.D. Miss. 2000). "Procedural unconscionability can be shown by: (1) lack of knowledge; (2) lack of voluntariness; (3) inconspicuous print; (4) the use of complex, legalistic language; (5) disparity in sophistication or bargaining power of the parties; and/or (6) lack of opportunity to study the contract and inquire about the terms." *Caplin Enters., Inc. v. Arrington*, 145 So.3d 608, 614 (Miss. 2014). Edward alleges that the first, second, fifth, and sixth factors weigh in favor of procedural unconscionability. Doc. #11 at 7–9.

"A lack of knowledge is demonstrated by a lack of understanding of the contract terms *arising* from inconspicuous print or the use of complex legalistic language, disparity in sophistication of parties, and lack of opportunity to study the contract and inquire about contract terms." *Taylor*, 826 So. 2d at 715-16 (quoting *Bank of Indiana, Nat. Ass'n v. Holyfield*, 476 F.Supp. 104, 109–10 (S.D. Miss. 1979)) (emphasis added). Edward concedes that the Agreement does not use inconspicuous print or complex language. Doc. #11 at 7 n.7. And, although Edward alleges Judy lacked an understanding of the terms of the Agreement, there is no evidence that such lack of understanding was *caused* by inconspicuous print, legalistic language, a disparity in sophistication, or lack of an opportunity to study the contract terms. Indeed, there is absolutely no evidence demonstrating that Judy lacked an opportunity to study the Agreement's terms. Thus, the first, third, fourth, and sixth factors weigh against a finding of procedural unconscionability.

The second factor, voluntariness, "alone is enough to find [procedural] unconscion[ability]." *Entergy Miss., Inc. v. Burdette Gin Co.*, 726 So.2d 1202, 1207–08 (Miss. 1998). "Procedural unconscionability is most strongly shown in contracts of adhesion presented

to a party on a take it or leave it basis." *Id*. (internal quotation marks omitted). A contract of adhesion, in turn, "has been described as one that is drafted unilaterally by the dominant party and then presented on a take-it-or-leave-it basis to the weaker party who has no real opportunity to bargain about its terms." *Taylor*, 826 So.2d at 716 (internal quotation marks omitted). Where there is a contract of adhesion, voluntariness will weigh in favor of unconscionability if: (1) "there is a great imbalance in the parties' relative bargaining power;" (2) "the stronger party's terms are unnegotiable;" and (3) "the weaker party is prevented by market factors, timing or other pressures from being able to contract with another party on more favorable terms or to refrain from contracting at all." *Id*.

There is no dispute that the Agreement was drafted by Defendant. Additionally, Edward alleges, and the terms of the Agreement confirm, that the document was presented on a take-it-or-leave it basis. *See* Doc. #4-1 at ¶ 1 ("**THIS AGREEMENT MUST BE SIGNED IN ORDER FOR THE RESIDENT TO RECEIVE SERVICES AT THE FACILITY.**") (emphasis in original). Further, Edward has alleged, and confirmed by affidavit, that at the time Judy was admitted, she was suffering from serious medical issues and that there were "few if any similar facilities that could care for" her. Doc. #10-7 at ¶ 9.

Under these circumstances, the Court concludes that Edward has adequately alleged and substantiated facts justifying the following findings: (1) the Agreement was drafted by Defendant and was non-negotiable and, therefore, is a non-negotiable adhesion contract, *see Taylor*, 826 So.2d at 716; (2) Judy had a need for care and, therefore, there was a great imbalance in bargaining power between her and Defendant, *see Arrington*, 145 So.3d at 620 (Coleman, J., dissenting) (imbalance in bargaining power of parties may arguably be demonstrated where party seeking services has immediate need for services not otherwise

12

available); and (3) there was a limited number of available nursing home facilities and, consequently, Judy was limited by market factors from being able to contract with another party, *see Burdette Gin Co.*, 726 So.2d at 1208 (finding procedural unconscionability where signatory "was unable to contract with another party since [plaintiff] was sole supplier of electricity in the area"). Accordingly, Edward has offered sufficient allegations and evidence to make "some" showing that the Agreement is procedurally unconscionable due to lack of voluntariness. *Id*. ("[T]he indemnity clause was procedurally unconscionable and therefore unenforceable."). The making of the Agreement therefore is in issue by virtue of Edward's allegations regarding the Agreement's procedural unconscionability.

## B. Hearing Requirement

As explained above, when the making of an agreement is in issue, a Court must hold a hearing unless there is no genuine issue of material fact or the evidentiary record has been sufficiently developed.

In this case, there are genuine issues of material fact related to the making of the Agreement, including the degree of Judy's mental impairment and confusion at the time of admission, and whether there were available nursing home alternatives at the time of admission. Furthermore, the evidentiary record is far from developed. There has been no arbitration-related discovery. The parties have submitted only one affidavit and no depositions. The underlying admission agreement itself has not been submitted.[10] Accordingly, the Court concludes that the parties have not been afforded an opportunity to sufficiently develop the record. *See Interbras*

---

[10] This Court has previously held that where an arbitration agreement relates to admission at a health-care facility, the failure to file the corresponding admissions agreement or other evidence "evinc[ing] a transaction involving interstate commerce" justifies denial of a motion to compel arbitration. *See Smith v. Liberty Health & Rehab of Indianola, LLC*, 4:14-cv-00161 (N.D. Miss. Sep. 4, 2015) (Doc. #16 at 2). Defendant did not submit the relevant admissions agreement or other evidence showing that the Agreement relates to a transaction involving interstate commerce. This failure provides separate grounds for denial of the motion to compel.

13

*Cayman Co. v. Orient Victory Shipping Co., S.A.*, 663 F.2d 4, 5 (2d Cir. 1981) (requiring hearing where record consisted of affidavits and other papers). Because no circumstances justify a decision on the evidentiary record, the Court concludes that a hearing is required.

When a hearing is required pursuant to § 4, the proper course is to deny a pending motion compel arbitration without prejudice to its resubmission on request following the required hearing on the issue of capacity. *See Brent v. Priority 1 Auto. Grp., BMW of Rockville*, 98 F.Supp.3d 833, 838–39 (D. Md. 2015); *see also Gudge v. 109 Rest. Corp.*, No. cv-14-2208, __ F.Supp.3d __, 2015 WL 4716559, at *4 (E.D.N.Y. Aug. 6, 2015) ("Defendants' motion to compel arbitration is denied, without prejudice to renew following a hearing on whether the parties agreed to arbitrate and specifically whether Plaintiff signed a lease agreement."). Accordingly, Defendant's motion to compel arbitration will be denied without prejudice to renew following a hearing on the enforceability of the Agreement.

## V
## Conclusion

For the reasons above, Defendant's motion to compel arbitration [4] is **DENIED without prejudice** to renew following a hearing on the enforceability of the Agreement. The hearing on the enforceability of the Agreement will be set by separate notice.

**SO ORDERED**, this 8th day of February, 2016.

/s/ **Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**